IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PHILADELPHIA INDEMNITY<br>INSURANCE COMPANY<br>One Bala Plaza<br>Bala Cynwnd, Pennsylvania  19004 | * * * | |
| and | * | |
| THE CHIMES, INC.<br>4815 Seton Drive<br>Baltimore, Maryland  21215 | * * | Civil Action No.:  05-CV-1005<br><br>JUDGE LAMBERTH |
| and | * | |
| CHIMES, DISTRICT OF COLUMBIA, INC.<br>4815 Seton Drive<br>Baltimore, Maryland  21215 | * * | |
| PLAINTIFFS<br>v. | * | |
| PERMANENT SOLUTION<br>INDUSTRIES, INC.<br>also known as<br>PSI FACILITIES MANAGEMENT<br>5400 Eisenhower Avenue<br>Alexandria, Virginia  22304<br>Serve: Byong Y. Kim<br>        President and Resident Agent | * * * * | |
| and | * | |
| SIEMENS BUILDING TECHNOLOGIES, INC.<br>1000 Deerfield Parkway<br>Buffalo Grove, Illinois  60089<br>Serve: CT Corporation System<br>        1015 15th Street, N.W., Suite 1000<br>        Washington, D.C.  20005<br>        Resident Agent | * * * | |
| DEFENDANTS | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## AMENDED COMPLAINT

1

Plaintiffs The Chimes, Inc., Philadelphia Indemnity Insurance Company and Chimes, District of Columbia, Inc., respectfully file this Amended Complaint against Defendants Permanent Solution Industries, Inc., and Siemens Building Technologies, Inc., adopting and incorporating herein their original Complaint, and state as follows:

**Parties.**

1. Plaintiff The Chimes, Inc., is a non-profit corporation organized under the laws of Maryland with its principal place of business in Maryland, and Plaintiff Chimes, District of Columbia, Inc., is its subsidiary, organized under the laws of the District of Columbia with its principal place of business in Maryland (collectively, "Chimes"). Chimes provides education, vocational training, employment, and other assistance to people with disabilities, and also provides janitorial services.

2. Plaintiff Philadelphia Indemnity Insurance Company ("Philadelphia") is a corporation organized under the laws of Pennsylvania with its principal place of business in Pennsylvania. Philadelphia is in the business of insurance and provided commercial general liability insurance to Chimes.

3. Defendant Permanent Solution Industries, Inc., also known as PSI Facilities Management ("PSI"), is a corporation organized under the laws of Virginia with its principal place of business in Virginia. PSI is in the business of providing facilities management services, including but not limited to engineering services for building operating systems.

4. Defendant Siemens Building Technologies, Inc. ("Siemens"), is a corporation organized under the laws of Delaware, with its principal place of business in Illinois and offices throughout the United States. Siemens is in the business of designing, manufacturing, selling, installing, maintaining and repairing building operating systems, among other things.

**Jurisdiction and Venue.**

5. Jurisdiction is proper in this Court on the basis of diversity of citizenship. Plaintiff The Chimes, Inc., is a corporation incorporated under the laws of the State of Maryland and has its principal place of business in Maryland. Plaintiff Chimes, District of Columbia, Inc., is a corporation incorporated under the laws of the District of Columbia and has its principal place of business in Maryland. Plaintiff Philadelphia is a corporation incorporated under the laws of the State of Pennsylvania and has its principal place of business in Pennsylvania. Defendant PSI is a corporation incorporated under the laws of the State of Virginia and has its principal place of business in Virginia. Defendant Siemens is a corporation incorporated under the laws of the State of Delaware and has its principal place of business in Illinois. The matter in controversy exceeds $75,000, exclusive of interest and costs.

6. Venue is proper in this District under 28 U.S.C. Sec. 1391(a). The events giving rise to this claim occurred in the District of Columbia and the property on which the flooding damage that is the subject of this action occurred is located in the District of Columbia.

7. PSI is subject to personal jurisdiction in this District because PSI engages in a continuous and systematic course of business activity in Washington, D.C., from which it derives substantial revenue. PSI regularly contracts to provide building operation, maintenance and engineering services in Washington, D.C. PSI contracted to operate the building systems in the Washington D.C. building that allegedly malfunctioned due to PSI's engineer's error, causing the flooding damage that is the subject of this action.

8. Siemens is subject to personal jurisdiction in this District because it engages in a continuous and systematic course of business activity in Washington, D.C., from which it derives substantial revenue. Siemens manufactured and installed, and contracted to maintain and repair

3

the building operating system in the Washington, D.C., building that allegedly malfunctioned due to a defective valve, causing the flooding damage that is the subject of this action.

**Facts common to all counts.**

9. Chimes was awarded a contract by the United States Government through the General Services Administration ("GSA") to provide commercial facility management, including engineering services (the "government contract") at the Interstate Commercial Commission, Customs and the connecting wing buildings located at 12th and Constitution Avenues, N.W., Washington, D.C. ("ICC complex"). The initial term of the government contract was April 1, 2002, to March 31, 2003.

10. Chimes subcontracted with PSI to provide all engineering and building operation and related services at the ICC complex as required by the government contract. PSI held itself out to Chimes as having extensive experience in all aspects of building facility maintenance and engineering.

11. PSI submitted a proposed subcontract to the government contract, under which PSI agreed to handle all matters involving operations, maintenance and engineering of all heating, ventilating and air conditioning ("HVAC") systems within the ICC complex. The GSA reviewed and approved the PSI subcontract.

12. Thereafter, Chimes and PSI entered into a subcontract to the government contract under which PSI assumed complete responsibility for the operation and maintenance of the HVAC system of the ICC complex, including engineering services (the "PSI subcontract"). PSI agreed to provide all labor, materials and equipment necessary for the performance of its work.

13. All work performed by PSI at the ICC complex under the PSI subcontract was as an independent contractor responsible for its own means and methods of performance. PSI's work was required to comply with the terms of the government contract, manufacturer's

recommendations for the equipment and systems in the ICC complex and industry standards. The initial term of the PSI subcontract was April 1, 2002, to September 30, 2002.

14.   Siemens designed, manufactured and installed the building operation system in the ICC complex, which provides control for the operation of the cooling system and the HVAC system, among other things.

15.   PSI subcontracted with Siemens for Siemens to provide technical support and preventative maintenance and repairs at the ICC complex (the "Siemens subcontract"). Under the Siemens subcontract, Siemens agreed to trouble shoot and diagnose system problems, consultat and assist PSI in resolving problems, conduct maintenance, repair and replace failed or worn components to maintain the system in peak operating condition, provide a dedicated account engineer and provide technical assistance. In addition, Siemens agreed to train PSI in the operation of the Siemens building systems. Among other things, Siemens was required to perform maintenance and repairs of the valves in the building operating system.

16.   On May 20, 2002, a cooling tower at the top of the ICC complex overflowed for six hours, causing flooding and significant water damage on six floors of offices below. PSI claimed that the flooding was caused by the malfunctioning of a valve manufactured and maintained by Siemens. Siemens claimed that that the flooding was caused by the errors of PSI engineers operating the ICC complex building system.

17.   PSI claimed that the flooding continued for six hours without being discovered because the Siemens system did not sound an alarm. Siemens claimed that the flooding continued for six hours without being discovered because PSI's engineer failed to conduct appropriate inspection tours of the ICC complex.

18.   As the direct and proximate result of the malfunctioning of the Siemens' valve, alarm and building system, and the negligence of the PSI employees operating the building

system and inspecting the ICC complex, the cooling tower overflowed, flooding the ICC complex and causing substantial damage.

19.     Pursuant to the government contract and the Federal Acquisition Regulations incorporated therein, GSA demanded payment from Chimes, and Chimes legally was obligated to and did pay to clean up and repair the flood damage. Chimes incurred costs and expenses of $230,563.42 for water removal, drywall, painting, wall and door repairs, furniture relocation, damaged carpet replacement and other repairs, to clean and repair the damage from the flood. In addition, the GSA demanded that the Chimes pay its costs from the flooding of $47,040.00. Chimes incurred total expenses of $280,694.50 all of which were necessitated as a direct result of the actions and omissions of PSI and Siemens.

20.     Chimes demanded that Philadelphia pay Chimes' flood clean up and repair costs under Chimes' insurance policy. Philadelphia paid Chimes' costs of $204,038.42 and is subrogated to Chimes' rights against PSI and Siemens to that extent. Chimes, itself, incurred additional costs in the amount of $76,656.08, which were not paid by Philadelphia, and it asserts claims for these damages in its own right. In addition, Chimes and Philadelphia incurred attorneys' fees and other costs as a direct result of the actions and omissions of PSI and Siemens.

21.     The flood damage and the resultant clean up and repair costs of $280,694.50 incurred by the Plaintiffs were caused solely by the actions and omissions of the Defendants.

**Count 1 – Breach of Contract against PSI.**

22.     The Plaintiffs incorporate all prior paragraphs herein by reference.

23.     PSI employees operated the ICC complex building system, including the cooling towers. The PSI employees operating the ICC complex building system opened a cooling tower valve and left it in open position, overriding the automatic building system mode and then opened a valve allowing water to enter the cooling tower. Because of the PSI employees'

6

actions, the cooling tower valve could not close when it should have. As a result, the cooling tower overflowed, causing a flood.

24. The flood continued for six hours until a PSI employee finally discovered it and closed the valve. PSI breached the subcontract by improperly operating the building operation system, causing the May 20, 2002, flood and property damage at the ICC complex.

25. PSI should have operated the building on automatic mode, which would have prevented the over flow from occurring, according to the system manufacturer, Siemens.

26. Additionally, the extent of the flood damage was caused by the PSI employee's failure to conduct appropriate inspections of the ICC complex, as required by the subcontract. The PSI employee on duty on May 20, 2002, should have noticed the flooding and taken immediate action to stop it, if he had conducted the inspection tours as required, which would have lessened the extent of the flood damage.

27. Chimes was obligated to pay of all costs to repair and clean up the flood damage, under the terms of the government contract, and GSA demanded immediate payment. Chimes and Philadelphia incurred the flood clean up and repair costs of $280,694.50.

28. PSI is contractually obligated to indemnify Chimes for damages incurred by Chimes' due to PSI's employees' actions, under the subcontract, as follows:

> PSI shall indemnify and hold [the Chimes] harmless with respect to all claims, liabilities, damages, losses, costs, or expenses, including reasonable attorney's fees and expenses and other costs of defense ... provided that such loss arises out or is based on: (i) [PSI]'s performance of services hereunder; (ii) any breach of any representations, warranties or agreements made by [PSI] in this subcontract; ... (v) any bodily injury, including death and/or damage to property, caused by any product or service supplied by [PSI]; (vi) any negligent act or omission by [PSI] or its employees, agents or subcontractors in connection with the subcontract; and (vii) any bodily injury including death or damage to property caused by the condition of any premises, equipment, or other property being used, delivered or operated by any of [PSI's] employees, agents or subcontractors in connection with this subcontract.

29. Despite numerous demands, PSI has refused to indemnify Chimes for costs incurred for the flood damage repair and clean up, in breach of the subcontract. PSI also agreed to pay Chimes' reasonable attorneys' fees incurred in this action, pursuant to the subcontract.[1]

30. Further, PSI contracted to purchase and maintain commercial general liability with per occurrence coverage of $1 million, naming Chimes as an additional insured, from the commencement of PSI's work under the subcontract until final payment. PSI agreed to provide a certificate of insurance to Chimes. Upon information and belief, PSI breached the subcontract by failing to purchase and maintain the required insurance.

31. Philadelphia is subrogated to the claims of its insured, Chimes, against PSI, to the extent that Philadelphia paid the flood clean up and repair costs that Chimes incurred.

WHEREFORE, the Plaintiffs demand judgment against PSI for $500,000, plus interest, costs, attorneys' fees, and other appropriate relief.

**Count 2 – Negligence against PSI.**

32. The Plaintiffs incorporate all prior paragraphs herein by reference.

33. PSI's engineers and other employees negligently operated the ICC complex building system by misaligning valves and other negligent acts. PSI's negligent operation of the building system caused the cooling tower to overflow, resulting in a flood. PSI's engineers and other employees failed to conduct inspection tours of the ICC complex and/or negligently conducted inspection tours by failing to discover the flood and take appropriate action to stop the flow of water. As a result, the flood continued for six hours and caused substantial water damage on six floors of offices.

---

[1] The PSI subcontract arguably may require arbitration of certain claims by Chimes against PSI (but not Chimes' claim against Siemens). Chimes contends that it does not. Chimes filed a demand for arbitration of its claim against PSI with the American Arbitration Association, to preserve the statute on its claim, in the event that this Court determines that arbitration of this claim is required under the PSI subcontract.

34. Chimes and Philadelphia were required to and did incur costs of $280,694.50 and other damages to clean up and repair the flood damage caused by PSI's negligence.

WHEREFORE, the Plaintiffs demand judgment against PSI for $500,000, plus interest, costs, attorneys' fees, and other appropriate relief.

**Count 3 – Indemnity against PSI.**

35. The Plaintiffs incorporate all prior paragraphs herein by reference.

36. PSI is contractually obligated to indemnify Chimes for damages incurred by Chimes' due to PSI's employees' actions, under the PSI subcontract, and has failed to indemnify Chimes despite numerous demands.

WHEREFORE, the Plaintiffs demand judgment against PSI for $500,000, plus interest, costs, attorneys' fees, and other appropriate relief.

**Count 4 – Breach of Contract/Third Party Beneficiary Against Siemens.**

37. The Plaintiffs incorporate all prior paragraphs herein by reference.

38. PSI's subcontract with Chimes included responsibility for building operation system maintenance and repairs. PSI subcontracted with Siemens to provide the maintenance and repairs of the system required under the PSI subcontract and the government contract, including maintenance of the valves in the building operating system. Siemens held itself out as having high level expertise in the maintenance and repair of its building operation systems.

39. The specific purpose of the Siemens subcontract was to confer a benefit on Chimes by providing maintenance and repair services at the ICC complex as required under Chimes' government contract. Chimes was the intended third-party beneficiary of the Siemens subcontract.

40. PSI's chief engineer reported to Chimes that the cooling tower valve that controls the flow of water through the cooling system, which was manufactured, installed and maintained by Siemens, had malfunctioned, causing the flood on May 20, 2002.

41. PSI reported that the malfunctioning of the Siemens valve caused condenser water to be diverted, causing an overflow, and that a Siemens technician inspected the building system and confirmed this.

42. The Siemens' valves did not operate properly, with the result some of the valves could not be operated in the automatic mode. PSI's chief engineer reported that PSI had difficulty operating the ICC complex building system designed, manufactured and installed by Siemens, due to installation and design flaws or contaminants in the system.

43. On May 20, 2002, it was necessary for the PSI employee on duty to adjust the cooling system due to the outside temperature. A valve did not function properly and had to be regulated manually. The valve failed, resulting in insufficient air supply, which caused the cooling tower to overflow.

44. Siemens breached the Siemens subcontract by failing to perform necessary and appropriate maintenance and repair of the building operation system, including failing to perform appropriate and necessary maintenance and repair of the valves on the cooling towers. This resulted in some of the valves being inoperable and/or inoperable in automatic operation mode.

45. Siemens' failure to properly maintain and repair the valves resulted in the valves not operating correctly, causing the cooling tower overflow and the May 20, 2002, flood. Siemens' breach of contract caused injury to Chimes, by causing Chimes to incur substantial expenses to repair and clean up the flood damage.

46. Chimes and Philadelphia were required to and did incur costs of $280,694.50 and other damages to clean up and repair the flood damage caused by Siemens' breach of contract.

WHEREFORE, the Plaintiffs demand judgment against Siemens for $500,000, plus interest, costs, attorneys' fees, and other appropriate relief.

**Count 5 - Strict liability for defective product manufacture and design against Siemens.**

47. The Plaintiffs incorporate all prior paragraphs herein by reference.

48. Siemens designed, manufactured and installed the building system in the ICC complex. Siemens is strictly liable for the design and manufacture of the valve, alarm and other building system components in a defective condition that created an unreasonable risk of harm to persons and property whom Siemens should expect would use it. The valve, alarm and other building system components were expected to and did reach GSA for use at the ICC complex without any substantial change in condition.

49. The Siemens valves were defective in that some of the valves were completely inoperable and others were inoperable in automatic operation mode. PSI reported that an excessive amount of operator overrides were required to operate the building system, including in the chiller plant, which indicates significant software problems in the system.

50. In addition, no alarm sounded to indicate a problem at any time during the six hours of flooding, as should have occurred had the building system been designed and operating properly. A Siemens technician confirmed that no alarms sounded regarding the cooling tower problem. If the building system alarm had sounded when the cooling tower overflowed, it would have prevented the over flow from developing into a flood and the damage would have been less.

51. The valve, alarm and other building system components malfunctioned when used in the usual way for their intended use. In particular, the valve malfunctioned, the alarm did not sound, and the building system did not operate properly in the automatic mode. These defects in the design and manufacture of the building system caused the overflow of the cooling tower and the flooding of the ICC complex on May 20, 2002.

52. As a result of these defects, Chimes was legally obligated to and did pay and incur damages from the flood, causing damages to Chimes and to Philadelphia in the amount of $280,694.50.

WHEREFORE, the Plaintiffs demand judgment against Siemens for $500,000, plus interest, costs, attorneys' fees, and other appropriate relief.

**Count 6 – Indemnity against Siemens.**

53. The Plaintiffs incorporate all prior paragraphs herein by reference.

54. As the direct and proximate result of the failure of the Siemens' valve, alarm and building system, the cooling tower overflowed, flooding the ICC complex and causing substantial damage.

55. Chimes was legally obligated to and did incur costs to GSA under the government contract for the clean up and repair of the flood damage. In addition, Chimes and Philadelphia incurred substantial costs to third parties for clean up and repair services to the ICC complex, which Chimes was legally obligated to perform. The Plaintiffs incurred costs to clean up and repair the flood damage in the amount of $280,694.50, all of which were caused by the negligent acts and omissions of Siemens.

56. Further, Siemens is contractually obligated to indemnify PSI and its third party beneficiary Chimes, for losses including property damage resulting from Siemens' actions, omissions and the performance of services under the Siemens subcontract.

WHEREFORE, the Plaintiffs demand judgment against Siemens for $500,000, plus interest, costs, attorneys' fees, and other appropriate relief.

**Count 7 – Subrogation against PSI and Siemens.**

57. The Plaintiffs incorporate all prior paragraphs herein by reference.

58.  Philadelphia insured Chimes at all relevant times. Pursuant to the insurance policy, Chimes made a claim against Philadelphia for the payment of the costs Chimes incurred to clean up and repair the ICC complex flood damage. Philadelphia paid $204,038.42 of Chimes' claim, and is subrogated to Chimes' rights against PSI and Siemens to that extent. Philadelphia demands judgment from PSI and Siemens under each and every one of the foregoing causes of action, to the extent of its payment.

WHEREFORE, the Plaintiffs demand judgment against the Defendants for $204,308.42, plus interest, costs, attorneys' fees, and other appropriate relief.

## DEMAND FOR JURY TRIAL

The Plaintiffs demand a trial by jury on all issues.

Respectfully submitted,

_____
Shirlie Norris Lake, Esquire
Bar No.: 454327
Terri L. Goldberg, Esquire
Bar No.: MD09698
Eccleston & Wolf, P.C.
7th Floor, Scarlett Place
729 E. Pratt Street
Baltimore, Maryland 21202-4460
(410) 752-7474
*Attorneys for the Plaintiffs*